# In the United States Court of Federal Claims

No. 17-166C
(Filed: August 12, 2022)
**FOR PUBLICATION**

```
***************************************
DAVID BOLAND, INC.,                    *
                                       *
              Plaintiff,               *
                                       *
v.                                     *
                                       *
THE UNITED STATES,                     *
                                       *
              Defendant.               *
                                       *
***************************************
```

*Mark Gerard Jackson*, Jackson Holcomb LLP, Seattle, Washington, for Plaintiff. With him on briefs were *Stowell Holcomb*, Jackson Holcomb LLP, Seattle, Washington, *Christopher P. Sobba*, James Sobba, LLC, Kansas City, Missouri, and *Dennis L. Durkin*, Baker & Hostetler LLP, Orlando, Florida.

*Meen Geu Oh*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With him on briefs were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Patricia M. McCarthy*, Assistant Director, as well as *Kanale Sadowski*, Assistant District Counsel, U.S. Army Corps of Engineers, Honolulu District.

## OPINION AND ORDER

Plaintiff David Boland, Inc. ("Boland") contracted with the U.S. Army Corps of Engineers ("Corps") to build infrastructure supporting a planned aviation complex at Wheeler Army Airfield ("Wheeler") in Oahu, Hawaii. Some of Boland's work did not comply with the terms of the contract — a fact the parties do not dispute — and the Corps ordered Boland to remove and replace the non-conforming work at Boland's expense. Boland claims that the Corps' order was economically wasteful, and so seeks recovery of the costs of replacing its original work.

Boland has moved for partial summary judgment as to liability, and the government has moved for summary judgment.[1] For the reasons discussed below, both motions are **DENIED**.

## FACTS

In 2009, the U.S. Army began planning an additional aviation complex to support a military brigade at Wheeler. Defendant's Statement of Undisputed Facts ("DSUF") ¶ 1 (ECF 55-1).[2] The Corps awarded Boland a contract for infrastructure development at the site. Ex. 1 at BOL_000836. Among other things, Boland was to install concrete sewer manholes for a wastewater collection system. Appx43 § 3.1.4; *see also* Ex. 94 (Rasmussen Dep.) at 48:5–49:5.

Boland undisputedly breached the contract by installing non-conforming manholes. But the parties dispute the engineering and business consequences of the breach.

### A. The Contract

Three aspects of the contract are most relevant to the case.

First, although the contract was between Boland and the Corps, the completed wastewater collection system was to be owned and operated by a private firm — Aqua Engineers, Inc. ("Aqua"). Appx16, "Sewer Notes" n. 14; Supp. Appx108; Supp. Appx113 §§ C.1–C.2. Boland's work was supposed to be incorporated within a larger, pre-existing sewer system that Aqua already operated under a separate contract with the U.S. Army Garrison Hawaii, Directorate of Public Works ("DPW"). *See* Supp. Appx108; 10 U.S.C. § 2688. Aqua's contract provided that upon completion of underground infrastructure work by a contractor (*i.e.*, Boland), Aqua "shall allow" a service connection to its existing system, and that it would own the newly constructed

---

[1] Pl.'s Corrected Mot. for Partial Summ. J. (ECF 71) ("Pl.'s Mot."); Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. (ECF 63) ("Def.'s Resp."); Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. (ECF 67) ("Pl.'s Reply"); Def.'s Mot. for Summ. J. (ECF 55) ("Def.'s Mot."); Pl.'s Resp. to Def.'s Mot. for Summ. J. (ECF 64) ("Pl.'s Resp."); Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. (ECF 68) ("Def.'s Reply"). I heard oral argument on March 3, 2022. Tr. of Oral Arg. ("Tr.") (ECF 74). The parties filed supplemental briefs on an issue raised at argument. Pl.'s Suppl. Br. (ECF 75); Def.'s Suppl. Resp. (ECF 77); Pl.'s Suppl. Reply (ECF 78).

[2] Plaintiff's summary judgment evidence is collected primarily in several exhibits (designated "Ex.") to declarations accompanying its motion for partial summary judgment (ECF 50–54) and response to Defendant's motion (ECF 64). Plaintiff also submitted several exhibits accompanying its motion in limine to exclude Defendant's expert (ECF 38). Defendant's evidence is submitted via an appendix (designated "Appx") attached to its motion for summary judgment (ECF 55; ECF 55-2–55-3). Defendant has also submitted its DSUF and a supplemental appendix (designated "Supp. Appx") (ECF 63-3).

sewer lines and manage their operation. Supp. Appx114 § C.4.1; Supp. Appx117 § C.24.

Second, the contract required that the sewer manholes be reinforced with steel. In more than one provision, the contract incorporated ASTM C478, a manufacturing standard developed by ASTM International. *See, e.g.*, Appx37 § 2.3.1; Appx39 § 2.3.6.1; Appx71 § 2.3.5. The parties agree that ASTM C478 requires steel reinforcement. *See* Tr. at 17; Def.'s Mot. at 3; *see also* Appx2–3 (ASTM C478 §§ 4.1.1, 4.1.6).[3] The ASTM standard also provides that manhole components failing to conform to any of its requirements (including the requirement for steel reinforcement) are subject to rejection.[4] Appx8 (ASTM C478 § 14.8.1); Appx9 (ASTM C478 § 15.7.1).

ASTM compliance was also required by Aqua's Collection System Design and Construction Protocol ("Aqua Protocol"), which the contract incorporated by reference. Appx36 § 1.7; Appx16, "Sewer Notes" n. 14. Aqua's Protocol mandated that Boland follow "the requirements of the City and County of Honolulu Design standards." Supp. Appx46. Honolulu's standards, in turn, required that concrete manholes conform to ASTM standards. Ex. 40 at AE-002832 § 23.2D.

Third, the contract required Boland to strictly comply with the contract's terms. *See* Def.'s Reply, Add2 (requiring that Boland perform "in strict accordance with the terms of [the] solicitation"). It authorized the Corps to order "immediate corrective action" if Boland did not comply. Appx26 § 3.10; *see also* Ex. 111 at 15. Relatedly, Aqua's own contract conditioned its obligation to accept new wastewater service connections on "conformance to all of … the 'Aqua Protocol,'" *see* Supp. Appx117 § C.24, meaning that the contract permitted Aqua to reject Boland's work if Boland did not comply with the Aqua Protocol.

## B. Boland's Breach

The parties agree that Boland breached the contract by mistakenly installing manholes that were reinforced not with steel, but with synthetic fiber. Pl.'s Mot. at 5–6; Def.'s Mot. at 4. When the breach was discovered, Boland agreed to immediately

---

[3] The citation here is to an ASTM edition contemporaneous with events giving rise to litigation, approved as of Feb. 1, 2009. Appx2. The contract references C478M, the metric equivalent of C478, *see* Ex. 7 (ASTM C478M - 15a), the record's version of which post-dates the contract. The parties have not addressed the difference in effective dates, so I assume for purposes of this opinion that it is not material to the motions.

[4] Under a section on "Modified or Special Design," ASTM permits suppliers to "submit[] to the owner, *for approval prior to manufacture*, designs other than those prescribed in the specific section for a product" so long as "the product … meet[s] all the tests and performance requirements specified by the owner in accordance with the appropriate sections on manufacture and physical requirements." Appx3 § 5.2.1 (emphasis added).

replace several fiber-reinforced manholes awaiting installation. *See* Ex. 61 at GOV-0047116. But nineteen non-complying manholes had already been installed. Appx159; Appx161. Boland requested a variance from the Corps and suggested various guarantees and fixes, Ex. 22 at GOV-0001251, but was ultimately required to replace the manholes.

The Corps was initially amenable to accepting Boland's variance request. *See* Ex. 61 at GOV-0047117. Boland supported its request with engineering calculations purporting to show that once installed, fiber-reinforced manholes would perform equivalently to steel-reinforced ones. *See id.* at GOV-0047125–177. Plaintiff claims that a visual inspection of the installed non-complying manholes did not reveal any cracking, and Defendant does not dispute the point. *See* Ex. 52 (Salisbury Decl.) ¶ 10–14; Ex. 97 (Rogness Dep.) at 78:25–79:16; Tr. at 56. An internal review by the Corps thus determined that the manholes would "likely [be] able to handle loads/forces that [they are] subject to with the fiber reinforcing." Ex. 57 at GOV-0046392.

Yet the Corps ultimately rejected Boland's revised variance request, telling Boland that DPW and Aqua would not accept the sewer manholes because "they do not conform with [the Aqua Protocol]." Ex. 73 at GOV-0001533. The parties dispute Aqua's precise position and why Aqua was concerned. However, they seem to agree that Aqua was unwilling to accept Boland's work without some kind of guarantee on the government's part — perhaps continued ownership by the government, *see* Appx96 ¶ 11, perhaps insurance covering future defects, *see* Ex. 103 (Paul Dep.) at 30:4–14; Ex. 83 at GOV-0047575–78 — that would shift risk from Aqua to the government.

Boland was therefore required to remove the non-conforming manholes and replace them with ASTM-complying, steel-reinforced ones. Boland claims the cost of doing so was approximately $3.5 million. Ex. 87 at GOV-0004640.

### C. Engineering Evidence

The parties have offered expert evidence regarding the suitability of fiber-reinforced manholes. Plaintiff's experts argue — as Boland did when seeking a variance — that fiber-reinforced manhole sections could be expected to serve their purpose as well as steel-reinforced ones. *See generally* Ex. 105 (Marshall expert report); Ex. 106 (Rogness expert report).

Defendant does not argue with Plaintiff's expert calculations, so far as they go, but takes issue with what it characterizes as one of Plaintiff's assumptions. Defendant appears to agree that *intact* steel- and fiber-reinforced manhole covers would perform comparably when installed. Tr. at 56–57. Instead, Defendant's expert Dr. Lin Shen argues that the fiber-reinforced manholes were more likely to have had

defects when installed. Ex. 2 (ECF 38) at 3 ¶¶ 14–15. Those undetected cracks, Dr. Shen argues, could reduce the manholes' "service life." *Id.* at 6 ¶ 28. Although Dr. Shen acknowledges a visual inspection was completed on the installed manholes, *see* Ex. 1 (ECF 38) at 257:1–9, he suggests that it might have been "insufficient" because it might not have found, *inter alia*, small cracks or cracks that were hidden or buried. *See id.* at 241:16–22.

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment

To win a motion for summary judgment, a party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine" dispute of fact exists where "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As to materiality, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

"[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Anderson*, 477 U.S. at 255, and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Cross-motions for summary judgment should be evaluated as independent motions. "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313–14 (2d Cir. 1981)). "[T]he court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case," even when both parties contend that no material facts are disputed and summary disposition is appropriate. *Williams v. United States*, 144 Fed. Cl. 218, 230 (2019) (citing *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)).

## B. Contract Interpretation and Economic Waste

The parties' competing summary judgment theories hinge on interpretation of the relevant contracts and on the contractual doctrine of economic waste. I discuss the applicable principles in turn.

"Contracts to which the government is a party are subject to the general rules of contract interpretation," which necessarily "begin[] with the language of the written agreement." *Westlands Water District v. United States*, 109 Fed. Cl. 177, 191 (2013) (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). When reviewing contract provisions, I assign clear and unambiguous terms their plain and ordinary meaning without resort to parol evidence. *See Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997).

Economic waste doctrine is governed in this Court principally by a single decision from the Federal Circuit: *Granite Construction Co. v. United States*, 962 F.2d 998 (Fed. Cir. 1992). In that case, the government ordered a private contractor building a lock and dam to remove and replace waterstop that did not strictly comply with the contract. *Id.* at 1003–04. The Federal Circuit held that the order resulted in economic waste, *id.* at 1007–08, and so allowed the contractor to recover net costs of correcting its nonconforming work, *id.* at 1008.

A contractor can recover correction costs under the economic waste doctrine when two elements are met: "[1] [T]he cost of correction is *economically wasteful* and [2] the work is *otherwise adequate for its intended purpose*." *Id.* at 1007 (emphasis added). When those elements are met, the government may obtain a downward adjustment of the contract price, but it is liable for net correction costs if it orders replacement of the contractor's work. *Id.* at 1007; *see also H. L. C. & Assocs. Const. Co. v. United States*, 367 F.2d 586, 600 (Ct. Cl. 1966); *Farwell Co. v. United States*, 148 F. Supp. 947, 949–50 (Ct. Cl. 1957).

As to the first element, a cost of correction is "economically wasteful" when it is disproportionate to the loss of value that resulted from noncompliance. *Granite Constr.*, 962 F.2d at 1007 (discussing *Jacob & Youngs v. Kent*, 129 N.E. 889, 230 N.Y. 239 (1921), and the *Restatement* (Second) *of Contracts*, § 348(2)). As to the second, work is "adequate for its intended purpose" when it "substantially complie[s]" with contractual specifications. *Id.* A contractor's performance can be substantially adequate when it "departs in minor respects from that which ha[s] been promised," *Franklin E. Penny Co. v. United States*, 207 Ct. Cl. 842, 856 (1975); *see also Blinderman Constr. Co. v. United States*, 39 Fed. Cl. 529, 573 (1997) ("[S]ubstantial completion need not, and ordinarily does not, amount to *total* completion."), but not where it is "fundamentally less than [what the parties] had … bargained for."

*Franklin E. Penny*, 207 Ct. Cl. at 857–58. Substantial compliance is a factual question that "depend[s] in large measure upon the character and extent of the partial failure — upon its relative importance to the party affected by it." *Thoen v. United States*, 765 F.2d 1110, 1115 (Fed. Cir. 1985) (quoting *Corbin on Contracts* § 700 (1960)).

The underlying substance of the test is less complicated than it might seem. Both elements depend on comparing the value of the contractor's actual performance with the performance the contract would have strictly required. *See Reliable Contracting Grp., LLC v. Dep't of Veterans Affs.*, 779 F.3d 1329, 1335 (Fed. Cir. 2015) (citing *Granite Construction* for the proposition that "rejecting performance of a contract in which the performance is entirely adequate for the purpose of the project is economic waste"). The burden is on the contractor to prove that its rejected work (or proposed correction) substantially complied with the contract. *Granite Constr.*, 962 F.2d. at 1005.

Two aspects of the economic waste doctrine deserve emphasis. First, the doctrine applies even where — as here — the contract calls for strict performance.[5] As the *Granite Construction* court explained, although the government "generally has the right to insist on performance in strict compliance with the contract specifications and may require a contractor to correct nonconforming work[,] … the government should not be permitted to direct the replacement of work in situations where" the economic waste doctrine applies. 962 F.2d at 1006–07.

Second, when resolving factual questions about the adequacy of a contractor's original nonconforming work, a court should look to all the evidence developed in litigation, not just the information available to the government at the time it ordered the work to be corrected. *Id.* at 1005–06.

## II. **Factual Questions Preclude Summary Judgment**

Under the *Granite Construction* test, the main question is the adequacy of Boland's fiber-reinforced manholes as compared to the steel-reinforced manholes the government contracted for. If they were adequate for their intended purpose, then ordering Boland to remove and replace them was economically wasteful. *Granite Constr.*, 962 F.2d at 1007. A related question is whether Aqua's refusal to accept Boland's work without guarantees from the government meant that Boland's performance was fundamentally less than what the government bargained for.

---

[5] Ordinarily the government is entitled to receive what it contracted for. *Granite Constr.*, 962 F.2d at 1006–07. The economic waste doctrine thus does not reach situations where a *contractor* sues for an equitable adjustment after offering something other than what the contract requires. *Elastomeric Roofing Associates, Inc. v. United States*, 26 Cl. Ct. 1106, 1107–08 (1992); *Fort Myer Constr. Corp. v. United States*, 42 Fed. Cl. 720, 728 (1999), *aff'd*, 230 F.3d 1380 (Fed. Cir. 2000).

*Franklin E. Penny*, 207 Ct. Cl. at 857–58. Because there are genuine issues of material fact on both questions,[6] summary judgment must be denied.

### A. Engineering Equivalence

The parties differ sharply on whether the non-complying fiber-reinforced manholes were functionally equivalent to the steel-reinforced manholes specified by the contract. I conclude that the disagreement constitutes a genuine dispute of material fact that precludes me from granting either party's motion for summary judgment.

The engineering equivalence of fiber- and steel-reinforced manholes is material to the *Granite Construction* standard for economic waste. It relates to whether the cost of replacing the former with the latter is disproportionate to the loss in value caused by the non-complying manholes. *Granite Constr.*, 962 F.2d at 1007. It also relates to whether the fiber-reinforced manholes were "otherwise adequate for [their] intended purpose." *Id.*

The issue, however, is genuinely disputed. Boland has developed extensive evidence — from its expert witnesses, its variance request documentation, and the Corps' own determination — purporting to show that "the fiber reinforced manholes … perform as well as, or better than the steel reinforced ones." Ex. 61 at GOV-0047169; *see also* Ex. 97 (Rogness Dep.) at 40:21–25; Ex. 57 at GOV-0046392 (Corps' internal review). As mentioned above, the government does not contest Boland's engineering calculations. Tr. at 56–57. If Boland's engineering can be taken at face value as a substitute for ASTM compliance, Boland's installed manholes may well have been adequate for their purpose.

The government instead argues, based on the opinions of its expert Dr. Shen, that Boland's data assume the manholes were structurally intact when they were placed in the ground. Tr. at 56–57; Appx119 ¶ 27. That assumption, Dr. Shen opines, is not supported by data, and is in fact contradicted by evidence of cracking on uninstalled manholes. Appx118–19 ¶¶ 23–28. Dr. Shen believes that fiber-reinforced concrete is more likely than steel-reinforced concrete to crack before installation. Appx116 ¶¶ 13–15; Appx118–19 ¶¶ 23–28; Ex. 1 (ECF 38) at 106:8–21, 112:10–18. If the manholes were cracked when installed, their service life would be shorter than expected. Appx119 ¶ 27. As a result — the argument goes — Boland's engineering data do not show that the actual, as-installed manholes were equivalent to the

---

[6] I have not tried to comprehensively identify the issues of disputed fact (or legal questions) that might need to be resolved to decide the case, only the ones that most evidently require denying the motions for summary judgment.

manholes the government contracted for. Tr. at 58; Appx119 ¶¶ 27–30; Ex. 1 (ECF 38) at 241:16–22; 246:5–247:9.

Boland derides the government's theory as based on "invisible cracks." *See* Pl.'s Resp. at 19 n.66; Pl.'s Reply at 4. Fiber reinforcement, Boland contends, both protects concrete from cracking before installation and prevents cracks from spreading. *See* Pl.'s Mot. at 32–33; Pl.'s Reply at 4–5; *see also* Ex. 22 at GOV-0001275–76; Ex. 61 at GOV-0047129. Boland also claims that small cracks "are not a cause for rejection under any applicable standard" and that no damage was found on the installed manholes. *See* Pl.'s Reply at 4–5; *see also* Appx8 § 14.8.1.5 (the rejection metric for risers and conical tops); Appx9 § 15.7.1.5 (base sections).

Those arguments may be reasonable, but they do not permit summary judgment. Most obviously, the parties' experts disagree about the different effects of steel and fiber reinforcement on the risk of cracking before installation. *Compare, e.g.*, Appx116 ¶¶ 13–15 (Dr. Shen), *with, e.g.*, Ex. 96 at 60:9–16 (Mr. Marshall). Technical questions such as those are usually subjects for expert testimony and cross-examination, not summary judgment. *Crown Packaging Tech., Inc. v. Ball Metal Bev. Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) (citing *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1578 (Fed. Cir. 1991)). That leaves a dispute about whether substitution of fiber-reinforced concrete made it more likely that Boland's manholes were cracked when they were installed.

Likewise, although no cracks were identified on visual inspection of the installed manholes, Dr. Shen maintains that there could have been cracks in places the inspectors could not see. Ex. 1 (ECF 38) at 258:1–259:1. That implies that the visual inspection may not have been enough to rule out cracking in the installed manholes. If the inspection might have missed cracking — and if any overlooked cracks could have been significant enough to weaken the installed manholes — it would cast into doubt Boland's assumption that the installed manholes were sound. Whether or not the visual inspection in fact ruled out cracking is thus another material factual dispute.

In short, because the parties disagree about whether Boland's fiber-reinforced manholes were equivalent to steel-reinforced ones as installed, there is no basis to determine as a matter of law that they were adequate for their intended purpose. The factual questions related to engineering adequacy preclude summary judgment.

### B. Aqua's Position

Although the Corps originally concluded that Boland's fiber-reinforced manholes were adequate, it rejected a variance and ordered replacement because Aqua would not accept Boland's work as-is. Depending on whether fiber-reinforced

manholes are equivalent to steel-reinforced ones that conform to ASTM C478, issues about Aqua's objection might not be material under the economic waste doctrine.[7] But if Aqua's views *do* matter for some reason, its discomfort with Boland's work could mean that Boland's work did not give the Corps "to all intents and purposes *all* benefits which [it] reasonably anticipated receiving under the contract." *Franklin E. Penny*, 207 Ct. Cl. at 858 (citing *In Re Kinney Aluminum Co.*, 78 F. Supp. 565, 568 (S.D. Cal. 1948)). Questions of fact related to Aqua's position preclude summary judgment.

One purpose of government contracts is to allocate risk. *See, e.g.*, Ralph Nash, *Risk Allocation in Government Contracts*, 34 Geo. Wash. L. Rev. 693, 718 (1966) ("[T]he Government and the contractor thoroughly spell out the agreed risk allocation in the contract document. The pricing provisions are the major risk allocation device …. Contract clauses allocate cost responsibility for more specific occurrences that can be foreseen.") (quoted in *Fruehauf Corp. v. United States*, 218 Ct. Cl. 456, 474–75 (1978)). Here, the relevant contracts provided that Aqua would ultimately accept and take ownership of Boland's sewer work. In so doing, they allocated the risks of the system — once completed and accepted — to Aqua.

The parties seem to agree that Aqua was unwilling to accept those risks after Boland's noncompliance came to light, at least not without qualifications that would have shifted some of the risk or expense back to the government. If the Corps had accepted Boland's work, it could have found itself in litigation with Aqua or negotiating over concessions that it may or may not have been in a position to grant. *See* Supp. Appx114 § C.4.1 (mandating that Aqua, not the government, "accept full ownership and liability for the wastewater system"); Supp. Appx113 (describing a privatization initiative for "the transfer of ownership, responsibilities, investments, upgrade, plants replacement, continued operation and maintenance of the Army-owned utility system to the non-Department of Defense sector"); *see also* Supp. Appx117 § C.24 (conditioning Aqua's obligation to accept new service connections on its Protocol being fully met). Reallocating risk from Aqua to the government would

---

[7] The parties appear to disagree about Aqua's legal status with respect to Boland's work, and they have not briefed the issue. Tr. at 31, 56. Regardless, Aqua was bound by the economic waste doctrine too. Economic waste is a background condition on Aqua's contractual right to reject non-complying wastewater service connections under its contract with DPW. *See Granite Constr.*, 962 F.2d at 1007 (citing *Eastern S.S. Lines v. United States*, 125 Ct. Cl. 422 (1953)); Supp. Appx117 § C.24. Or perhaps Aqua was an assignee of the Corps' own contractual right to accept or reject Boland's work. In that case, the Corps — itself limited by the economic waste doctrine — could not grant Aqua more power than the Corps had to begin with, nor assign its own powers in a way that "materially changes the duty of [Boland] or materially increases the risk of performance [Boland] undertook when the contract was formed." *Corbin on Contracts* § 49.1 (2022).

have left the Corps with something less than the full "benefits which [it] reasonably anticipated receiving under the contract." *Franklin E. Penny*, 207 Ct. Cl. at 858.

Whether it would have been "*fundamentally* less than [what the Corps] had … bargained for," though, is a different matter. *Id.* at 857–58 (emphasis added). The parties disagree — each with some support in the record — about exactly what Aqua's concern was and what Aqua wanted. Def.'s Mot. at 17; Pl.'s Mot. at 36; *compare, e.g.*, Appx96 ¶11 (suggesting Aqua expected the government to replace the manholes or else retain title), *with, e.g.*, Supp. Appx211 at 114:6–25 (suggesting that Aqua's acceptance would be conditioned on the Corps "bear[ing] all liability in perpetuity"), *and with, e.g.*, Ex. 103 (Paul Dep.) at 30:4–14; Ex. 83 at GOV-0047575–78 (suggesting Aqua wanted the government to cover future repairs). The parties have not pointed to any evidence of how any of the possible concessions to Aqua should have been valued from the government's perspective.[8] And answering any of those questions depends on how reasonable Aqua's concerns were in light of (disputed) engineering evidence.

Because there is a genuine dispute about Aqua's position and its likely cost to the government, there is no way to decide as a matter of law whether addressing Aqua's concerns while accepting Boland's non-complying performance would have left the Corps with "fundamentally less than [what it] had … bargained for." *Franklin E. Penny*, 207 Ct. Cl. at 857–58. And that, in turn, makes it impossible to resolve at summary judgment whether ordering Boland to replace its nonconforming work in order to reassure Aqua was economically wasteful.

### C. The Government's Motion

The government moves for summary judgment on the theory that Boland cannot claim substantial compliance and that the contract's requirement of strict compliance with ASTM C478 — which Boland undisputedly violated — in effect displaces the economic waste doctrine. *See* Def.'s Mot. at 12–17; Def.'s Reply at 5 n. 3; Tr. at 61. The government also argues that Aqua's objections preclude Boland from showing that the manholes were adequate for their intended purpose. *See* Def.'s Mot. at 17–20; Tr. at 61–62.

As discussed above, however, Boland's substantial compliance is in question, and the economic waste doctrine overrides strict compliance requirements, not the

---

[8] Boland offered various solutions short of replacement, including a 20-year warranty to defray the expenses of maintaining the non-complying manholes. Ex. 22 at GOV-0001253, GOV-0001260; Appx164, 167. However, there is evidence that manholes can be expected to last 50 years under normal operating conditions. Appx295 at 81:10–24. The value of Boland's offer, in comparison to the assurances Aqua wanted from the Corps, is another potentially disputed factual question.

other way around. *Granite Constr.*, 962 F.2d at 1006–07. Given that the engineering equivalence of fiber- and steel-reinforced concrete is disputed, the question whether Boland's engineering calculations substitute for ASTM compliance should await a factual resolution as well. Nor, again, is it clear how Aqua's objections should be valued, or whether they matter at all in light of the (unresolved) questions of engineering. The government's motion for summary judgment must therefore be denied.

## CONCLUSION

For the foregoing reasons, both motions for summary judgment are **DENIED**. The parties are **ORDERED** to submit a joint status report proposing further proceedings in this case no later than **September 12, 2022**.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge